## CHARLES K. MILLER, APPELLANT, VS. JAMES M. GASKINS, APPELLEE.

The testator devised as follows:—"I give and bequeath to my friend Charles K. Miller, Sarah and William Henry, in trust, that he will allow the said Sarah to go, if she wishes, to any free State, and for that purpose I direct my executor to pay him out of my estate one hundred dollars, and upon trust that he will have William Henry bound out to a useful trade until he is twenty-one, and upon further trust that he will allow Sarah and William Henry to enjoy such privileges and freedom as is consistent with law, and I direct that the said Charles K. Miller shall have the sole control and management of them for the purpose herein expressed, without account to any one:" *Held*, that it was not the intention of the testator to vest the absolute ownership to Sarah and William Henry in Miller so as to enable him to hold them and make them work as other slaves, but only to give him the sole control and management of them for the purpose of allowing Sarah to go to a free State if she wished, of binding William Henry out, and of allowing to both all the privileges and freedom that the law would permit; that it was the intention of the testator to place these slaves in a sort of middle state between freedom and slavery, making Miller their master for the purposes of their protection, but not for the purpose of using them as slaves; that said bequest is void, being in contravention of the policy of our laws prohibiting slaves from going at large or being partially free or trading as free, or living alone on a plantation without a white person, &c.; that Sarah being a slave could not elect as to whether she would or would not go to a free State; and that said devise being void, said slaves were not disposed of by the will of the testator and consequently remain a part of his estate.

This case was decided at Tallahassee.

A statement of the case is contained in the opinion of the Court.

*D. P. Hogue* for Appellant.

*M. D. Papy* for Appellee.

WALKER, J., delivered the opinion of the Court.

The bill in this case alleges that Thos. G. Gaskins, late of the county of Wakulla, departed this life on the 13th day of June in the year 1862, having first made his last will and testament, a copy of which is filed with the bill and prayed to be taken as part thereof; that said Gaskins had three children, Christina, William G. and appellee by whom the bill is filed; that Christina died before the testator, leaving two children, one by Allen Felkel, her first husband, and the other by her second husband, Edward Barco; that William G. also died before the testator, leaving no issue; that amongst other dispositions of property made by the will of Thos. G. Gaskins, the sixth clause is as follows: " I give and bequeath to my friend Charles K. Miller, Sarah and William Henry, in trust, that he will allow the said Sarah to go, if she wishes, to any free State, and for that purpose I direct my executor to pay him out of my estate one hundred dollars, and upon trust that he will have William Henry bound out to a useful trade until he is twenty-one; and upon further trust that he will allow Sarah and William Henry to enjoy such privileges and freedom as is consistent with law, and I direct that the said Charles K. Miller shall have the sole control and management of them for the purpose hereinbefore expressed, without any account to any one."

The bill further alleges that Miller took possession of said slaves with the permission of Barco, the executor, and has in a great measure given to the slave Sarah her freedom, allowing her to go at large without any restraint, without payment of any wages to him and without any subjection to him as master; that Miller has the boy William Henry with him in his possession in camps, to wait upon him and serve him as a slave in all respects, and treating him with great severity; that said boy has not been put to a trade

according to the will, but used for Miller's own private and individual purposes.

The prayer of the bill is that said sixth clause of the will may be declared void, and for general relief.

The answer of Miller states, " that true it is, Thomas G. Gaskins made the will mentioned in the bill of complaint, and that said will contains the bequest therein set forth in reference to the slaves, Sarah and William Henry ; that said Miller received said slaves from Barco, the executor, as alleged in the bill ; defendant denies that he has given the slave Sarah her freedom, or that she goes at large without restraint.   Defendant admits he has the boy William Henry in camps with him, but denies that he is treated with severity, but that he treats him as a slave in all respects, as he does also the other slave Sarah.   Defendant states that he has been unable to comply with the testator's request in regard to William Henry, but fully intends to do so and to hold him as a slave if allowed by law to do so.   Defendant states that he is advised that the disposition made of said slaves is not illegal," &c.

A guardian *ad litem* having been appointed for the two grand children of the testator, the cause was submitted to the Judge of the Middle Circuit on the bill, answer and exhibit, and said Judge decreed that said sixth clause of said will was void, and ordered said slaves to be sold and the proceeds distributed among the distributees of the estate of said Thomas G. Gaskins.

The appellant then brought the case to this Court.

The only duty of this Court, therefore, in regard to the case under consideration is to determine the validity or invalidity of the sixth clause of the will of Thomas G. Gaskins, as hereinbefore recited.   In order to determine upon its validity or invalidity, let us carefully consider and ascertain what was the true intent and meaning of the testator, for " it is the first and great rule in the exposition of wills, and

to which all other rules must bend, that the intention of the testator expressed in his will shall prevail, provided it be consistent with the rules of law." See 2 Wend. Black. 380, note 17.

Did the testator mean to vest in Charles K. Miller the unqualified and absolute property in those slaves, free from all trust and confidence, so that he might hold them as slaves, sell them, have them liable to execution for his debts, or at his death to be distributed among next of kin? Looking at the language used, we cannot think so. If such had been the object of the testator, he would have used the simple and unqualified language of bequest employed by him in each of the five preceding clauses of his will. In the first clause he says, "I give and bequeath to my son, William G. Gaskins, my *slaves*, named," &c.; in the second, "I give and bequeath to my son, William G. Gaskins, my *slaves*, Solomon," &c.; in the third, I give and bequeath to my grandson, Edmond Barco, my *slaves* Nelly," &c.; in the fourth, "I give and bequeath to my grand-daughter my *slaves* Rose," &c.; and in the fifth clause he makes an absolute bequest to Carry Hines Ferrel. It will be perceived that in each of these five clauses he uses the plain and unqualified language of bequest, and that whenever slaves are given they are mentioned as slaves, but when we come to the sixth, the clause under consideration, we find very different language. Sarah and William Henry are not called slaves, and almost every line of the clause bears indubitable evidence that he never intended they should be slaves, in the ordinary acceptation of the term.

The language of the testator in this clause is, " I give and bequeath to my friend, Charles K. Miller, Sarah and William Henry, in trust, that he will allow the said Sarah to go if she wishes to any free State, and for that purpose I direct my executor to pay him out of my estate one hundred dollars, and upon *trust* that he will have William Henry bound

out to some useful trade until he is twenty-one, and upon further trust that he will allow Sarah and William Henry to enjoy such *privileges* and freedom as is consistent with law, and I direct that said Charles K. Miller shall have the sole control and management of them for the purpose hereinbefore expressed, without account to any one."

It is too plain for discussion that the testator did not mean to vest the absolute ownership in Miller, for though he says he gives and bequeaths Sarah and William Henry to him, he immediately negatives the idea of an absolute conveyance by saying that the bequest is made in trust for the purpose then named. And though the testator, in the conclusion of this clause, says, "I direct that the said Charles K. Miller shall have the sole control and management of them," yet he is careful to add "for the purpose herein expressed, without account to any one." Thus it appears that when the testator gives and bequeaths these persons to Miller, it is only upon the *trust* immediately expressed, and when he directs that Miller shall have the sole control and management of them, it is not for the purpose of enabling Miller to own them and make them work like other slaves, but only "for the purpose herein expressed"—that is for the purpose of allowing the woman to go to a free State if she should wish, of binding out the boy, and allowing both "to enjoy all the privileges and freedom consistent with law." This is the whole extent of his power and control over them. The testator invested him with the "sole control and management of them" for this purpose and no other. When Miller received the slaves under the will, he was obliged to take them subject to its trusts. He cannot reject the trusts and take property absolutely, for this would be to defeat instead of to execute the testator's will.

Having arrived at the conclusion that it was not the intention of the testator to confer the absolute property in these slaves on Miller, but only to charge him with the

execution of certain trusts concerning them, let us next consider whether the trust can be executed without a violation of law. It appears that the testator intended these slaves to occupy a sort of middle state between slavery and freedom—that he intended Miller to be their master and owner so far as might be necessary to protect them, for illustration, against the laws enacted against free negroes, and against all persons who should attempt to interfere with them, but that he should not be their master or owner to exact service and labor from them, or at any rate not more service than would keep up the semblance of ownership in order to enable him to carry out the great object of the devise.

With this view of the intention of the testator, we have no difficulty in pronouncing this devise null and void. There is no evil against which the policy of our laws is more pointedly directed than that of allowing slaves to have any other status than that of pure slavery. By our act of 1828, the master or employer of a slave is forbidden to allow such slave to go at large and trade as a freeman. No trustee or other person having the control of slaves shall allow them to hire themselves out, and slaves are prohibited from being kept on a plantation without some white person. By our act of 1832, if any person having the legal control of a slave, shall suffer him or her to go at large and trade as a free person, such person so offending shall be fined in a sum not exceeding one hundred dollars, at the discretion of the jury. These and various other statutory enactments clearly indicate that it is the policy of our laws to prohibit every thing like *quasi* emancipation. We find a case very much in point on this subject in third Jones' North Carolina Equity Reports. It is the case of Lea vs. Brown, in which Justice Pearson, delivering the opinion of the Court, said: "It may seem hard that one is not allowed to dispose of his own property as he pleases; but private right must yield to the

public good.  The policy which forbids emancipation, unless the freed negroes are sent out of the State, and the policy which forbids quasi emancipation, by which particular negros are to be allowed privileges and are not to be required to work like other negros, but to some extent to have a discretion, is fully settled by the numerous cases which have been before this Court."  Judge Pearson then proceeds to cite the North Carolina statutes on the subject of allowing slaves to go at large, hire their own time, &c., which are the same in substance as those of our own State, which I have cited.  He then proceeds thus: "In our case, had the testator tried on purpose he could not have more directly violated the provisions of this statute, or more effectually contravened the fixed policy of the State.  Here we have a family of negroes with two hundred acres of land and three thousand dollars in money to provide for their support, so that they may not be made to work like other negroes."

In answer to the argument that the woman was to be allowed to go out of the State if she wished, we say that she being a slave is incapable of electing to go to a free State. In the case of Williamson et. als. vs. Coalter's executors, (14 Gratton's Reports, 396,) the Court say : " It was decided in the case of Bailey vs. Poindexter that slaves have no legal capacity to elect between freedom and slavery ; and that where it appears to have been the intention of the testator that the manumission was to depend on the election of the slaves, the bequest was void ;" and again : " If the testator designed to refer the question of slavery or freedom to the election of the slave, then he has, ignorantly perhaps, attempted to confer a capacity on the slave with which he cannot be endowed, and the bequest is void."

In the case of Abercrombie's executor vs. Abercrombie's heirs, 27 Ala., 494, Goldthwaithe, Justice, delivered the opinion of the Court and said: " If by the directions given by the testator as to the government and treatment of the

children until they arrived at age, it was intended that until the period fixed for their emancipation they should occupy a condition of qualified freedom, then unquestionably the trust would be invalid. Our law recognizes no other status than that of absolute freedom or absolute slavery; and if it was the object of the testator that the slaves should remain in the State, invested with privileges which by law do not belong to that class of population, the intention would be illegal and the trust in which it is embodied illegal"—citing Washington vs. Blount, Ired. Eq. 253; Atwood vs. Beck, 21 Ala., 588, 615.

Having determined that the sixth clause under consideration is void, it follows of course that the property attempted to be devised by it was not disposed of by the will of Thos. G. Gaskins, and remains a part of his estate.

Therefore, it is ordered, adjudged and decreed by this Court that the final sentence and decree of the Hon. Judge of the Middle Circuit be and the same hereby is in all things affirmed.